## THE PROGRESO.

## STREET *et al. v.* THE PROGRESO.

## WATERBURY *v.* STREET *et al.*

### *(Circuit Court of Appeals, Third Circuit.* May 24, 1892.)

1. CHARTER PARTY—EXCEPTIONS—"RESTRAINTS OF PEOPLE"—QUARANTINE.
   Quarantine regulations which interfere with the charter engagements of a vessel are fairly within the clause of a charter excepting liability for results caused by "restraints of princes, rulers, and people."

2. SAME—DETENTION BY QUARANTINE—DUTY OF VESSEL WHEN QUARANTINE ENDED.
   A vessel, having by charter agreed to be at a certain port by the 1st of October, "restraints of princes, rulers, and people excepted," and having been prevented from going there during October by quarantine regulations at such port, was held bound to have been at the port on the 1st of November, when she knew the quarantine would be raised.

3. SAME—OPTION OF CANCELLATION—WHEN EXERCISED.
   A charter provided that if the vessel should not arrive at Charleston, her loading port, on or before a certain day, charterers should have the option of canceling the charter, option to be declared when vessel was ready to load. The vessel being delayed, her agents called upon the charterers, while the vessel was at Boston, to declare whether they would load or not. Charterers declined to exercise their option, whereupon the ship canceled the charter. *Held,* that such demand by the ship was premature, that charterers were not bound to exercise their option until the vessel was at Charleston, and that the ship was liable for any damages caused charterers by her breach of the charter.

   42 Fed. Rep. 229, affirmed.

Appeal from the District Court of the United States for the Eastern District of Pennsylvania.

In Admiralty. Libel by Thaddeus Street, Timothy Street, and Thaddeus Street, Jr., against James M. Waterbury, owner of the steamship Progreso. Decree below for libelants. Defendants appeal. Affirmed.

*J. Warren Coulston* and *Robert D. Benedict,* for appellants.

*J. Rodman Paul* and *N. Dubois Miller,* for appellees.

Before ACHESON, Circuit Judge, and WALES and GREEN, District Judges.

GREEN, District Judge. From the record in this cause, it appears that in the latter part of August, 1888. the appellant, James M. Waterbury, owner of the steamship Progreso, then on a voyage from Cuba to the United States, did, through his agents, Belloni & Co., of New York city, by a certain charter party, demise and let to freight his said steamship Progreso to the firm of Street Bros., of Charleston, the appellees. The charter party, after providing that the steamship should, with all convenient speed, sail and proceed under steam to Charleston, S. C., there to load from the charterers a full and complete cargo of cotton in bales, to be conveyed to Liverpool, contained also, *inter alia,* two clauses or provisions which are of importance in the determination of this litigation, and which read as follows:

"Should the steamer not arrive at her loading port, and be in all respects ready to load under the charter, on or before the first (1st) day of October,

1888, the charterers have the option of canceling the same, to be. declared when vessel is ready to load. The customs and usages of the ports of loading and discharging to be observed, unless otherwise expressed." "The act of God, the queen's enemies, fire, epidemics, strike or lockout of stevedores' men, draymen, or press hands, stoppage or destruction of goods on railway or at press, restraint of princes or rulers or people, collision, any act, neglect, or default whatsoever of pilot, master, or crew, in the management or navigation of the ship, and all other damages and accidents of the seas, rivers, and steam navigation, throughout this whole charter party, being excepted."

From the evidence in the cause, it appears that the Progreso, having taken on board at Havana a full cargo of sugar, sailed thence direct for Philadelphia. Reaching the Delaware breakwater on September 3d, she was detained by the proper authorities for a few hours at quarantine, and subsequently, for several days, at the lazaretto below Philadelphia, finally arriving at the latter port on September 10th. On that same day, Belloni & Co., agents for the appellant, as stated, evidently having heard rumors of impending or existing quarantine regulations at Charleston, which possibly might interfere with the arrival of the Progreso at that port, wrote to Street Bros. to the effect that the ship would arrive at Charleston about the 20th of September with a clean bill of health, and asking if, under such circumstances, she would be in danger of detention at quarantine; expressly stating that they could not afford to send the ship to that port if she was to be quarantined. In reply to this communication, by a note under date of September 12th, Street Bros. notified Belloni & Co. that, after submitting their letter of the 10th September to the board of health, they were officially informed that the Progreso would not be permitted to come up to Charleston, because of the quarantine, until November 1st. Thereupon, Belloni & Co. ordered the ship to proceed to New York for repairs, and, declining to keep her idle until she could safely sail for Charleston, sought and obtained a cargo for an *ad interim* voyage from Norfolk, Va., to Bremen. She arrived at Bremen November 6, 1888. From Bremen she sailed to Hamburg; accepted there a return cargo to Boston, at which port she arrived December 19th. On December 20th, the day following, the Progreso being at Boston, Belloni & Co. made formal application to Street Bros. to exercise the option in the charter party reserved to them upon failure of the ship to arrive at Charleston on or before October 1st, by requesting a declaration from them whether they would load the ship if she then proceeded to Charleston, to which Street Bros. replied that they would insist upon and claim all their rights under the charter party. Belloni & Co. then finally declined to send the ship to that port, and Street Bros., conceiving themselves aggrieved by such action, filed their libel to enforce the recovery of such pecuniary damages as they claimed they had suffered thereby. Upon these facts the contention of the appellant is that by the very terms of the charter party the Progreso was not required to go to Charleston if restrained by "princes, rulers, and people," and that she was in fact so restrained, within the meaning of the charter party, by the enforced quarantine at that port; and, *secondly*, that if she was bound to go to Charleston, by the terms

of her contract, she fully complied therewith by the tender made imme-
diately upon her arrival at Boston.

It may be taken as settled that "detention at quarantine" is fairly in-
cluded in the scope of that clause in this charter party which has refer-
ence to the "restraints of princes, rulers, and people." Quarantine reg-
ulations and health laws, so called, although often affecting in their
operation a direct and palpable regulation of commerce, are constantly
made and prescribed by states, and even by local municipal corpora-
tions, and pass everywhere, unchallenged, as the result of a legitimate
exercise of that police power which resides in sovereignty. Such regu-
lations would be worthless unless the enforcement were sure; and such
certainty of enforcement is attained by virtue of the power of the people,
as exhibited and exercised through their governmental agents. It fol-
lows, then, that enforced obedience to lawfully-prescribed quarantine reg-
ulations is a "restraint" of natural liberty of action devised by and pro-
ceeding from the "people." The Progreso was therefore clearly entitled
to the benefit of this exception as a valid excuse for her default in per-
formance of those terms and conditions of her contract, which the quar-
antine regulations at Charleston deprived her of ability to perform.
What, then, were those terms and conditions? With the performance
of what part of her contract did this "restraint" so seriously interfere?
By the charter party the ship had contracted to arrive at Charleston on
October 1st. Doubtless, if her freedom of sailing had not been interfered
with by the quarantine regulations of that port, she could readily have
complied with her agreement. But the enforcement of these regulations
made it simply impossible for her to arrive at that port at the date des-
ignated. Not until a month later, November 1st, would she be permit-
ted to reach Charleston, as she had been notified. Not until then could
she be ready to load. But on that day there would be, at least, no
"restraint of people" to bar her movements, or cause further delay and
detention. Quarantine regulations were then to be done away with.
Then and after that time they were as if they never had been. The
ship would be free to come and go at that port as she pleased. The
plain and indeed only result, then, of these quarantine regulations, was
to work a temporary retardation in and hindrance of the ship's move-
ments. The "restraint" could be for a limited time only. It operated,
it is true, to delay the arrival of the Progreso at Charleston until Novem-
ber, but then its force would be spent. For such delay, so caused, this
clause in the charter party afforded ample excuse and protection to the
ship. An unsurmountable barrier had been placed in her course to
Charleston by the strong hand of the law. Until that barrier was re-
moved, she was helpless to keep and perform that part of her contract
which demanded her presence at the port of loading on October 1st.
But, when the cause of her helplessness was removed, her ability to per-
form was restored to her. Nowhere in the record is anything alleged as
excusing her nonperformance after that date. Under the admitted cir-
cumstances, her failure to arrive at Charleston on the date fixed for ar-
rival is therefore wholly excusable. But no valid excuse existed or has

been suggested for her failure to arrive there after her way had been cleared of obstacles. With the raising of the quarantine came free ingress to the port. Her course on November 1st to the Charleston wharves was straight and free. Her contract was "to proceed to Charleston with all convenient speed;" that is, with all speed possible under the circumstances. It cannot be doubted that the Progreso could have been at Charleston by November 1st if she had made "all speed possible under the circumstances" to arrive there, as she was bound by her contract to do. A charter party is to be construed in consonance with well-established rules which obtain in the construction of contracts generally; and no canon of construction is more often resorted to than that the language used by the contracting parties must receive a reasonable construction, expressive of the intent of the parties, and tending to promote the object in view. Here it was the obvious intent of the parties to this charter party that the Progreso should proceed to Charleston within a reasonable time to take on a cargo of cotton to be conveyed to Liverpool. The transportation of the cotton was the object to be attained. Whether that transportation commenced on October 1st or November 1st was not as material as that the cotton should be transported. This is evidenced by the fact that delay in arriving at the port of lading did not avoid the contract by its terms, but such avoidance for such cause lay solely in the discretion of the charterers. Delay might have been vexatious. If negligently caused by the ship, it was punishable; but mere delay, in itself, did not defeat or destroy the agreement. Such delay, unless it be so expressly stipulated in the writing, never defeats a contract, unless time be of its very essence, and then generally at the option, only, of the innocent party. Here it is clear that neither party regarded time as of the essence of the contract. As the learned judge who heard this cause in the court below tersely says in his opinion:

"So long as the circumstances remained substantially unchanged, the delay being no greater than might reasonably have been contemplated, the contract remained in force. The month which elapsed made no material change. The respondent was still engaged in carrying merchandise, and able to keep her engagement, and the libelants still had merchandise to carry. She bound herself to go to Charleston and carry it, if she could get there in reasonable time; a time which answered the purpose for which she contracted to go."

Her failure to report, therefore, within the reasonable time, to the charterers at the port of lading, being wholly without excuse, constituted a breach of the charter party, for which she must be held responsible.

Nor do we think that the offer to send the Progreso to Charleston, while she was in the port of Boston, in December, upon condition that the charterers would then signify their consent to load her, was in any way a compliance with the terms of the charter party. The demand then made by Belloni & Co. upon Street Bros. to exercise their option of accepting the ship after this delay in arriving at the port of lading was premature, and while appealing, possibly, to the courtesy of the charterers, could not have any legal effect upon the obligations of the ship yet to be performed. By the contract the option reserved to the charterers was

not to be exercised or declared until the Progreso had arrived at Charleston, and was ready to load. This reservation of option was a specific right secured to the charterers by their contract. The language creating such right is clear and unambiguous. The time and the place and the circumstances at and under which the right could be exercised were definitely fixed. The obligation of that contract was inviolable. It could neither be altered nor amended save by mutual consent of the parties interested. The demand made on behalf of the ship while she was lying in the port of Boston, upon the charterers, to declare, then and there, their option, was wholly unwarranted by the contract. To have yielded to such demand, and to have declared their option, would have been an assent by them to a material and substantial alteration of the contract in an important particular. They were clearly justified in refusing such assent, and in standing by the terms of the charter party. That charter party was still in force, and the only legitimate act for the ship was to proceed under it to Charleston, and tender herself, on arrival, ready to load. Nothing short of that would excuse. Nor do we think that any principle of equity can be cited which would justify the ship then in making such demand, under the admitted circumstances. Equity does not favor alteration of contracts fairly entered into. Parties are free to make their own bargains, and they are bound to stand by them when made. As was said by the learned judge of the district court when this cause was before him, "equity never relieves against terms of a contract sued upon, except for fraud, accident, or mistake." Neither appear to enter into the execution of this contract. It was voluntary in its inception, and wholly free from taint.

Some question has been made as to effect of the delay which occurred between November 1, 1888, when the ship should have been at Charleston, and December 19, 1888, when she arrived, in fact, at Boston, after her *ad interim* voyage, and tendered herself ready to proceed to the port of lading. Counsel for appellant strongly insist that for such delay the ship should not be chargeable in any way, as it was caused by the *ad interim* voyage. This matter is only important in connection with the assessment of the pecuniary damage which the libelants were justly entitled to by reason of the ship's default, and it is sufficient to say that we perceive no ground upon which to base any different conclusion from that arrived at in the court below. The ship was undoubtedly justified in seeking an *ad interim* voyage. But such voyage should have been undertaken only upon such conditions and to such places as would have enabled her to be at Charleston on November 1st. Voyages which prevented that were not justifiable, and delay caused by such voyages cannot be held excusable. We are satisfied, also, that the assessment of damages, made by the special commissioner to whom that matter was referred, is computed upon proper basis, and is just and correct. We find no error therein. The result is that the decree below is in all things affirmed.