## TWEEDIE TRADING CO. v. GEORGE D. EMERY CO.

(District Court, S. D. New York. June 9, 1906.)

1. SHIPPING—CHARTER HIRE—DETENTION OF VESSEL AT QUARANTINE.

Under a charter party which required the owner to furnish the crew, and provided that, in case of loss of time from deficiency of men or stores, preventing the working of the vessel for more than 24 hours, the hire should cease during the detention, the charterer is entitled to a deduction of charter hire during the time the vessel was detained in quarantine in consequence of the illness of the crew, and the requirement of the quarantine officers that a new crew should be shipped before she was permitted to enter the port, which involved a delay of more than 24 hours.

2. SAME.

A provision of a charter party mutually exempting "restraints of princes, rulers, and people" covers a detention of a vessel in quarantine, and exempts the charterer from the payment of hire during the time of such detention.

In Admiralty. Suit to recover charter hire paid.
See 143 Fed. 144.

Wheeler, Cortis & Haight, for libellant.
Convers & Kirlin, for respondent.

ADAMS, District Judge. This action was brought by the Tweedie Trading Company to recover from the George D. Emery Company certain prepaid hire of the steamer Osceola during detention at quarantine, Staten Island, in April, 1905.

The parties have stipulated as follows:

"1. The libellant made advances to the master of the Osceola for the respondent which constituted payment of the charter hire in advance up to the time of the steamer's re-delivery at the end of the charter, including hire at the charter rate for the period of the quarantine of the vessel, as hereinafter stated.

"2. The Osceola was detained at quarantine at the Staten Island station under the circumstances described in the master's deposition, from April 10th, 1905, at 2 p. m., until April 12th, 1905, at 9:30 a. m. a period of one day and nineteen and one-half hours. Charter hire for that period, at the rate provided in the charter party would amount to $245.81. During the detention at quarantine the steamer consumed eight tons of coal, which had been shipped in pursuance of clause 2 of the charter party, and was of the reasonable value of $26.80. The aggregate of these two amounts is $272.61.

"3. The charterer paid the ordinary pilotage of a ship entering port from sea for the services of the pilot in bringing the ship into quarantine on April 10, 1905. In consequence of the detention at quarantine, and solely by reason thereof, the charterer incurred further pilotage in bringing the ship from the quarantine station to her dock, amounting to $23.13.

"4. The parties have adjusted between themselves the items of claim and counterclaim referred to in the fifth and sixth articles of the libel, and in the sixth article of the answer herein, save only the claims of the libellant against the respondent enumerated in paragraphs 2 and 3 of this stipulation.

"5. No costs shall be recovered by either party on the final decision of this court herein."

From the master's deposition it appears that the vessel was quarantined on her way from the Barbadoes into the port of New York, during the time stated, owing to the sickness of the crew. She came in under a foul bill of health. She also had a foul bill from Para, the preceding port, to Barbadoes. The previous port was Buenos Ayres, from where she had a clean bill of health. Sickness appeared among the sailors and firemen of the crew after she left that port, which still continued after reaching New York, necessitating the shipment of a new crew, which being done, the quarantine restriction was removed, but the loss of time occurred and the question presented is whether the owner or the charterer should sustain it. The hire having been prepaid, the charterer sues to recover. The sickness probably arose through the carriage of live animals, which the charter party permitted. The provisions of the charter party, which have some bearing are:

"1. That the Owners shall provide and pay for all provisions and wages of the Captain, Officers, Engineers, Firemen, and Crew; shall pay for the Insurance on the vessel, also for all engine-room stores, and maintain her in a thoroughly efficient state in hull and machinery for the service.

"10. That the Captain shall prosecute his voyage with the utmost despatch, and shall render all customary assistance with the Ship's Crew and Boats.

"16. That in the event of loss of time from deficiency of men or stores, breakdown of machinery, or damage preventing the working of the Vessel for more than twenty-four running hours, the payment of hire shall cease from the hour when detention or inefficiency begins until she be again in an efficient state to resume her service;   *   *   *.

"18. The Ship has liberty to call at any ports in any order, to sail without Pilots, to tow and assist Vessels in distress, and to deviate for the purpose of saving life and property. The Act of God,   *   *   *   arrests and restraints of princes, rulers, and people,   *   *   *   always mutually excepted,   *   *   *.

"20. That the Owners shall have a lien upon all cargoes and all sub-freights or freights or hire due under this charter, and Charterers to have a lien on the Ship for all monies paid in advance and not earned."

It appears that the shipment of the new crew by the owner secured the release of the vessel. Until this was done the quarantine officials would not allow her to proceed. The new men, consisting of 8 sailors and 2 firemen at once took the place of the old ones, who were

removed by the health authorities, and brought the vessel to her wharf. The ill ones, though possibly physically able, were not allowed to take the vessel from quarantine. Until the new men were put aboard she was practically helpless. The contract intended that the owner should furnish the men necessary to work her. The language of the contract is clear in that respect and the authorities, so far as they touch the question, are decidedly in favor of the charterer's contention.

In The Ethel, 8 Fed. Cas. 798, No. 4,540, there was a loss of cargo through a deficiency of crew from desertions. The charter provided that she should be "well and sufficiently manned." It was held that it was the owner's duty to furnish the crew and keep them on board, so that the freighter would not suffer loss.

In The Eliza, 8 Fed. Cas. 459, No. 4,348, Judge Ware said (460): that the contingencies relating to a crew "the owner takes upon himself."

Further, the charterer was deprived of the use of the vessel during the quarantine, which circumstance brought into operation the 8th clause relating to the arrest and restraint of princes, rulers and people. With reference to this matter, it is said in Carver's Carriage by Sea, § 82:

"82. 'Restraints of princes, rulers, and peoples' covers any forcible interference with the voyage or adventure at the hands of the constituted government, or ruling power of any country * * *, whether done by it as an enemy of the state to which the ship belongs, or not. For example, orders of government prohibiting or restricting the exportation or landing of goods; quarantine regulations (f); embargoes, or restrictions on particular ships; blockades; confiscations of goods as contraband, and so forth."

The authority there referred to in support of the text "(f)" relating to quarantine is The Progreso, 50 Fed. 835, 2 C. C. A. 45. In that case the question was whether the vessel was required to go to a quarantined port. The court said (at page 837 of 50 Fed., at page 47 of 2 C. C. A.) :

"It may be taken as settled that 'detention at quarantine' is fairly included in the scope of that clause in this charter party which has reference to the 'restraints of princes, rulers and people.' Quarantine regulations and health laws, so called, although often affecting in their operation a direct and palpable regulation of commerce, are constantly made and prescribed by states, and even by local municipal corporations, and pass everywhere, unchallenged, as the result of a legitimate exercise of that police power which resides in sovereignty. Such regulations would be worthless unless the enforcement were sure; and such certainty of enforcement is attained by virtue of the power of the people, as exhibited and exercised through their governmental agents. It follows, then, that enforced obedience to lawfully-prescribed quarantine regulations is a 'restraint' of natural liberty of action devised by and proceeding from the 'people.' The Progreso was therefore clearly entitled to the benefit of this exception as a valid excuse for her default in performance of those terms and conditions of her contract, which the quarantine regulations at Charleston deprived her of ability to perform."

The libellant should have a decree for $295.74, but without costs as the parties have so stipulated.