GLASGOW STEAM SHIPPING CO. v. TWEEDIE TRADING CO.

TWEEDIE TRADING CO. v. GLASGOW STEAM SHIPPING CO.

(District Court, S. D. New York.  April 4, 1907.)

1. SHIPPING—CHARTER PARTY—PORTS EN ROUTE BETWEEN NEW YORK AND BRAZIL.

Halifax, Nova Scotia, *held*, under the evidence, not. a port en route between New York and the eastern coast of South America, so as to entitle a charterer to proceed by that port on such a voyage under a charter party giving it the right to stop at ports en route.

2. SAME—COAL DELIVERED TO CHARTERER—MARKET PRICE.

Under a clause, of a charter party for a steamer, which required the charterer to pay for the coal in the vessel's bunkers at the time of her delivery at the current market price, the price actually paid by the charterer in the port of delivery for coal bought in the open market to fill the bunkers, and also for other vessels at the same time, will be accepted as fixing the market price rather than the price given the owners on mere inquiries without any attempt to purchase.

3. SAME—SHORTAGE OF CARGO.

The owners of a vessel are not liable to a time charterer for a shortage in delivery of cargo which was received, tallied in, and stowed, and also taken out by the charterer's agents. and none of which was lost, jettisoned, or used during the voyage, although at the charterer's request the master gave a general receipt for the cargo.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 44, Shipping, § 435.]

4. SAME—SURVEYOR OF COAL ON REDELIVERY.

Where there was a difference in the estimates of the owners and charterer in respect to the quantity of coal in a steamer's bunkers at the time of her redelivery and each party called in a surveyor, each should bear his own expense.

5. SAME—CHARTER HIRE—DETENTION OF VESSEL IN QUARANTINE.

A provision of a time charter party mutually excepting restraints of princes, rulers, and people, etc., covers a detention of the vessel in quarantine, and exempts the charterer from the payment of hire during the time of such detention.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 44, Shipping, §§ 194, 195.]

In Admiralty.

See 143 Fed. 184.

Convers & Kirlin and Russell T. Mount, for Glasgow Company.

Moen & Kilbreth, for Tweedie Company.

ADAMS, District Judge.  The first of the above entitled actions, the Glasgow Steam Shipping Company against the Tweedie Trading Company, was brought to recover certain unpaid hire of the steamship Kelvinbank, under charter dated November 13, 1903, amounting to $1,837.68 and an additional sum of $500 for the balance claimed to be due by the respondent on 625 tons of coal on board of the steamer when it was delivered on the 3rd of December, 1903, making $2,337.68. The respondent defends on the ground that the libellant refused to allow the steamer to proceed to the River Plate, South America, by way of Halifax, Nova Scotia, and St. John, New Brunswick, and that because of such refusal the vessel was quarantined in the River Plate

and lost several days, during which time she was off hire. The respondent also filed a cross libel, claiming damages of $6,000 on account of the refusal to allow the steamer to be sent by way of Halifax.

There were several amounts claimed by the respondent which it was. called upon to pay and which it contends it should be reimbursed for by the libellant, to be noted hereafter.

The provisions of the charter party covering the disputed points are:

"That the said owners agree to let, and the said charterers agree to hire the said steamship from the time of delivery, for one trip from port or ports in United States to port or ports in Brazil &/or River Plate via port or ports en route Steamer to be placed at the disposal of the Charterers at New York. * * *

3. That the Charterers shall accept and pay at once on delivery of steamer for all Coal in the Steamer's Bunkers on delivery and the Owners shall on expiration of this Charter Party pay for all Coal left in the Bunkers, each at the current market prices, except as hereafter modified as to price on redelivery at the respective ports where she is delivered to them but it is mutually agreed that about 500 tons of coal is to be quantity left on board at port of redelivery the price of which is now agreed to be 27/6 per gross ton to be paid by steamer & owners on redelivery.

4. That the Charterers shall pay for the use and hire of the said Vessel Nine hundred and twenty-five pounds (£925) British Sterling per Calendar Month, commencing on and from the day of her delivery, as aforesaid, and at and after the same rate for any part of a month; hire to continue until her delivery, with clean holds to the owners, (unless lost) in the River Plate.

17. The act of God, enemies, fire, restraint of princes, rulers and people, and all dangers and accidents of the seas, rivers, machinery, boilers and steam navigation, and errors of navigation, throughout this Charter Party, always mutually excepted."

## Sending Vessel to South America via Halifax.

The principal controversy is that relating to the right claimed by the charterer to send the vessel to the River Plate via Halifax. This was before the court on exception to the cross libel and it was held that the matter was not determinable upon the pleadings but was open to testimony. Tweedie Trading Company v. Glasgow Steam Shipping Co., Limited (D. C.) 143 Fed. 184. Testimony has therefore been taken here by the libellant but none by the Tweedie Company except that of its president, Mr. Tweedie. A number of shipmasters and persons experienced in the trade have testified that Halifax and St. John could not, under any circumstances, be considered en route between New York and Brazil. It appears that there is no port on the direct line between New York and Pernambuco, the easternmost port of Brazil, but that some deviation from such a line is usually allowed which, however, would not include Halifax. This is substantially without contradiction by expert navigators, which Mr. Tweedie is not. There is no route from Halifax to Brazil shown on the Track Chart of the Hydrographic office of the Department of the Navy and it appears that there is no direct trade between the port of Halifax and places in South America, goods being usually sent by way of New York. The witnesses have said that ports south of New York might be considered en route to Brazil but not ports north of New York, which seems consistent with the general drift of the testimony and ordinary common sense. The respondent urges that the distance from New York to Pernambuco via Halifax is shorter than by way of Savannah,

Georgia, where the vessel went but that is immaterial. She went by way of Savannah because the contract provided for "ports in the United States" and Savannah was properly utilized under that provision. It does not affect this question. The parties could have included Halifax if they had wished but they did not do so. No provision was made in the owner's policy of insurance for such a risk and the president of the respondent recognized that the owner did not have the privilege of sending the vessel to Halifax without paying an additional premium for the extra risk.

It does not appear that the parties to the contract ever contemplated sending the vessel to any port in British North America and I must hold that the respondent was not entitled to send her to Halifax. The libellant contends that it was never requested to allow such privilege but I think that it sufficiently appeared the respondent claimed it indirectly and would doubtless have put the matter in more definite form if the owner had not anticipated the requirement and refused it in advance.

### Price for Coal on Board When Delivered.

The question of the amount which is recoverable for the coal on board depends upon the market price which prevailed in New York at the time of delivery there in December, 1903. Section 3 of the contract, quoted above, required that the rate should be determined by the current market price, and the dispute is as to what price then prevailed. The libellant contends that $3.60 per ton was the correct amount and the respondent that the amount allowed, $2.95 per ton— based upon what it paid by contract for other coal, $2.60 per ton, plus 35¢ per ton for putting it into the bunkers—was correct.

The libellant has shown by testimony that enquiries were made in the market for the price and it appeared to have been $3.24 alongside. The difference of 36 cents would be made up by the delivery in the bunkers. In Cliquot's Champagne, 3 Wall. 114, 125, 18 L. Ed. 116, the trial court charged the jury:

"The market value of goods is the price at which the owner of the goods, or the producer, holds them for sale; the price at which they are freely offered in the market to all the world; such prices as dealers in the goods are willing to receive, and purchasers are made to pay, when the goods are bought and sold in the ordinary course of trade. You will perceive, therefore, that the actual cost of the goods is not the standard. On the contrary, that having been the standard, the law has been changed, and for the standard of the cost has been substituted another standard, to wit, the actual market value."

The Supreme Court in affirming said (141) that evidence of this character was relevant and should be considered in connection with other evidence adduced by the parties. This testimony supports the libellant's contention, but on the other hand it appears that the respondent actually bought coal in the open market, trimmed into the bunkers, at $2.95 per ton. This steamer was furnished with coal at that price and many others at about the same time. I regard this as better evidence of the market value than mere enquiries without any attempts to purchase. The suggestion that it was poor coal is without weight. It is not probable that the respondent would furnish steamers it was operating on time charters with inferior coal. The respondent's contention in this respect will be sustained.

### Short Delivery of Cargo.

The charterer makes a claim for short delivery of a small portion of oil and rope cargo loaded at New York for Maceio and Rio. These consignments were received, tallied in and stowed by the charterer's agents. The master of the ship refused to receipt for them for such reason but subsequently upon the request of Mr. Tweedie, the chief officer gave a general receipt for the cargo. At places of destination all of the cargo was taken out by the charterer's agents. None had been lost, jettisoned or used during the voyage. The owner was not therefore liable for shortages. Golcar S. S. Co. v. Tweedie Trading Co. (D. C.) 146 Fed. 563, 566.

### Hire of Gear in Brazil.

This is claimed under the provision:

"22. That the owners are to provide ropes, falls, slings and blocks, necessary to handle ordinary cargo up to three tons (of 2,240 pounds each) in weight, also lanterns for night work."

The charterer says that it was obliged to incur this expense because the ship's gear was insufficient but the master testified that the ship's gear was in accordance with the contract and he was not informed that the charterer was employing additional gear. The charterer has not established a right to recover this item.

### Surveyor of Coal on Redelivery.

The question presented in this connection is, by whom a charge for survey fees and for boat hire incurred by the libellant should be paid. It appears that there was a difference in the estimate of the quantity of coal on board the vessel at time of redelivery and a surveyor was called in by each party to decide it. It is proper that each should bear its own expense.

### Quarantine in River Plate.

When the steamer went to that river she ran into a quarantine which delayed her for a period, said by the master to have been 48 hours. This should have been at the expense of the libellant, Tweedie Trading Co. v. George D. Emery Co. (D. C.) 146 Fed. 618, recently affirmed. The respondent is therefore entitled to credit for the hire for this period.

There will be a decree for the Glasgow Company, with an order of reference. The libel of the Tweedie Company will be dismissed.