NORTHERN S. S. CO., Limited, v. EARN–LINE S. S. CO.

(District Court, S. D. New York. March 30, 1909.)

SHIPPING (§ 176*)—RIGHTS OF CHARTERER—DETENTION OF VESSEL.

Where a vessel is detained by port authorities on account of the illness of her master and steward, and she is afterwards obliged to put into another port through this cause, the hire ceases for the time lost to the charterer.

[Ed. Note.—For other cases, see Shipping, Dec. Dig. § 176.*

Deductions and offsets from charter hire of vessel, see note to Tweedie Trading Co. v. George D. Emery Co., 84 C. C. A. 254.]

(Syllabus by the Judge.)

Convers & Kirlin, for libellant.
Horace L. Cheyney, for respondent.

ADAMS, District Judge. This action was brought by the Northern Steamship Company, Limited, to recover from the Earn-Line Steamship Company a balance of charter hire alleged to be due on the steamship Saltwell, which was in the employ of the respondent from December 17, 1904, at 3 p. m. to November 7, 1905, at 7 a. m. Certain payments were made, leaving £137.6.5, or $667.38, which it is alleged was improperly deducted from the hire and remained due. The respondent denies that the steamer was in its continuous service but avers that in the month of October, 1905, the steamer was in the port of Sagua, Cuba, under orders from the respondent to proceed to Progresso, after discharging her cargo; that the discharging was fully completed October 14, 1905, at 12 o'clock noon, but the steamer was then unable to proceed as ordered by the respondent, her master

and steward then being ill and incompetent and unable to perform their duties as officers of the vessel, in consequence of which the Public Authorities of Cuba refused to allow the steamer to leave the port of Sagua, until 3 o'clock October 17th, after a detention for a period of three days and three hours; that the steamer then instead of proceeding to Progresso, went into Havana, Cuba, for the purpose of obtaining medical treatment for the master and steward, who were still ill and unable to perform their duties, arriving there at 10 a. m. the 18th and remaining until 5 p. m. the 19th; that the steamer was consequently not in the service of the respondent while she was detained at Sagua and Havana; that the charter hire for the said period of four days and ten hours amounted to £103.5.10, and that the respondent by reason of these occurrences was obliged to pay certain port charges and other expenses amounting to $131.38, which it has withheld from the hire, which otherwise would have been due to the libellant on account of the charter hire; the respondent also alleges that it has deducted from the charter hire the sum of $34.01 for commissions on advances and other expenses. The respondent further alleges that all of the said charges, amounting to $165.39 have been properly deducted by it under the provisions of the charter party and it has paid to the libellant all of the hire due it; except the sum of $165.39 which it claims to offset against any claim of the libellant for the hire of the steamer.

The contract provided:

"16. That in the event of loss of time from deficiency of men or stores, breakdown of machinery, stranding, or damage preventing the working of the Vessel for more than twenty-four consecutive hours, the payment of hire shall cease until she be again in an efficient state to resume her service; but should the Vessel be driven into port or to anchorage by stress of weather or from any accident to cargo, such detention or loss of time shall be at the Charterers' risk and expense.

17. That should the Vessel be lost, freight paid in advance and not earned (reckoning from the date of her loss) shall be returned to the Charterers. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas, Rivers, Machinery, Boilers and Steam Navigation, and Errors of Navigation, throughout this Charter Party, always mutually excepted."

The depositions show that the Saltwell arrived at Sagua October 2, with a cargo of coal, and that her discharging was completed at noon October 14th, but she did not leave for Progresso, her destination, until the 17th, owing to the illness of her master and steward. The illness of the latter was not of importance as far as his work was concerned as his duties were performed by the ship's cook. The Public Authorities of Cuba, however, refused to permit the vessel to sail until the illness of both men had been properly diagnosed.

It appears that the master became ill on the 11th of gastric or jungle fever, the result of a mosquito bite on the 9th. The vessel at the time was discharging her cargo, which was not interfered with by the illness. The vessel completed her discharge at Sagua at noon of the 14th. A day or two before the master had received instructions to proceed to Progresso but the health authorities refused to allow the vessel to sail until the fever from which both men were suffering

could be properly diagnosed. The vessel did not receive her clearance until the 17th at 4 p. m., when she sailed. She then put into Havana. The master deposed:

"After leaving Sagua the first port the vessel put into was Havana. On the 18th October at 4 a. m. the Steward became seriously ill again; his temperature going up to 103°. As I was also very feeble with a high temperature and showing no signs of improvement as expected, I considered it prudent for the benefit of all concerned to enter Havana and obtain medical assistance. I accordingly proceeded into the harbour at Havana arriving at 10 a. m. on the 18th October. (b) I was able at that time to navigate the vessel. (c) I required and received medical treatment at Havana, as also did the Steward, from the time of arrival until we sailed again at 4 p. m. on the 19th October."

The master also deposed that the voyage of the Saltwell was delayed by putting into Havana to the extent of 31 hours, and further:

"The reason and cause of the delay was the Steward and myself were suffering from a severe attack of fever in consequence of which the Port Authorities refused to allow the vessel to be cleared until the fever could be properly diagnosed. * * *

"There was delay in departure of the vessel from Sagua on account of the action of the Port Authorities as detailed in the last preceding answer. * * *

"The Port Authorities at Havana gave permission for the Saltwell to leave Sagua on the 16th October, 1905, in the afternoon. * * *

"The reason the vessel did not sail immediately" (from Sagua) "was because the Charterers' Agent did not get authority to clear the ship until the afternoon of the 16th October owing to the Custom's Offices being closed and the clearance papers were not obtained by the Charterers' Agent and handed to me until the 17th October at 4 p. m. at which hour the vessel sailed. * * *

"The Saltwell was not prevented at any time after her arrival at Havana by any Public Authority from proceeding immediately to Progresso. * * *

"Under the British Law the Saltwell was required when going to sea from a place in the United Kingdom of Great Britain to carry a Master, Chief and Second Officers, Chief and Second Engineers duly certificated which requirements were duly fulfilled. * * *

"The Saltwell usually carried as officers a Master, Chief & Second Officers and First, Second and Third Engineers. These officers were all that were necessary for the safe and proper navigation and operations of the vessel. * * *

"If any of the Officers or crew had been left ashore at either Sagua or Havana the ship would have been shorthanded. * * *

"It was not possible for the Saltwell to have proceeded from Sagua before the day and hour she actually did proceed owing to the action of the Port Authorities nor would it have been expedient for the steamship to have proceeded direct from Sagua to Progresso in view of the physical condition of the Master and Steward at the time in question. * * *

"The steamship Saltwell would have been shorthanded if the Master and Steward had been left ashore at Sagua or Havana and the Steamship had proceeded without them. * * *

"To the best of my knowledge, information and belief, proper officers could not have been obtained at either Sagua or Havana to take the positions made vacant by leaving the Master or Steward ashore."

From the foregoing it would appear that the steamer was not in condition to be of service to the charterer during the times mentioned and the situation is apparently governed by the terms of the charter party, quoted supra. See Tweedie Trading Co. v. George D. Emery Co. (D. C.) 146 Fed. 618, affirmed 154 Fed. 472, 84 C. C. A. 253.

There does not seem to be any question about the correctness of the figures and the libel is dismissed.