## Case No. 6,652.

### HOLYOKE et al. v. DEPEW.

[2 Ben. 334.] [1]

District Court, S. D. New York. April, 1868.

CHARTER PARTY — RESTRAINT OF GOVERNMENT — DEAD FREIGHT—RECOUPMENT.

1. Where a vessel was chartered for a voyage to the Canary Islands and back to New York, the charter providing that the charterer should furnish, at the Canary Islands, 150 tons of barilla and 20 pipes of wine, or more, and the vessel arrived at the Canary Islands and discharged her outward cargo, on which freight was paid, and received on board 20 pipes of wine, but no barilla, although the charterer had it ready for her, because the authorities would not allow it to be put on board of her, unless she would first go to Vigo. in Spain, to quarantine, and the master refused to go to Vigo, but, after waiting the number of lay days specified, returned to New York, being obliged, for lack of the barilla, to put in at St. Thomas for ballast, and, on her arrival at New York, her owners sued the charterer to recover freight on the wine delivered, and dead freight for the 150 tons of barilla, and damages for being compelled to put in at St. Thomas: Held, that, as there was in the charter no exception of restraints of princes, there was an absolute engagement on the vessel's part to receive on board the barilla, even though the authorities of the Canary Islands should prohibit its being put on board.

2. In the absence of such a clause in the charter, the vessel was in fault in not being in a condition to receive the barilla, and the vessel, and not the charterer, must bear the loss.

3. The acceptance of the outward cargo, and the loading of the wine, did not excuse the failure of the vessel to put herself in a condition to receive the barilla.

4. The libellant was entitled to freight on the wine brought, but the charterer was entitled to recoup against it any damages set up in the answer, which arose out of any breach of the charter party by the libellants, to the amount of such freight, but, for any claim beyond that, he must resort to his own proper action.

[Cited in The Spartan, 25 Fed. 53.]

This was a libel for the breach of a charter party, brought by the owners of the schooner Ocean Belle against her charterer.

[1] [Reported by Robert D. Benedict, Esq., and here reprinted by permission.]

The charter was made at New York, on the 18th of May, 1866, by [George E.] Holyoke and [James] Murray to William Depew, and chartered the vessel for a voyage from Bath, Maine, to Charleston, South Carolina, "thence to Palmas, Grand Canary, and discharge outward cargo, and load part there, and the rest at one or two ports at Fuerteventura or Lanzarote, or one port in each of them, and back to New York." The charter provided that the vessel should receive on board, during the voyage, the merchandise thereinafter mentioned, and that the charterer should furnish to the vessel outward from Charleston a cargo of yellow pine lumber, and in the Canary Islands 150 tons of barilla and 20 pipes of wine, or more, at the option of the charter friends, and should pay to the owners "for the use of said vessel during the voyage aforesaid," a specified sum for each one thousand feet of lumber delivered at the Canary Islands, payable on proper delivery, "and homeward on barilla six dollars per ton, and five dollars per pipe for wine, payable on proper delivery of cargo, in gold or its equivalent;" "the cargo or cargoes to be received and delivered alongside within reach of the vessel's tackles," "charterers paying vessel's port charges in Canary Islands." The vessel took on board the lumber, and delivered it at Palmas. At Palmas she took on board 20 pipes of wine, but no barilla or any other cargo. The wine was delivered to the charterer at New York, but the freight was not paid. The libel averred, that the reason why the vessel brought home no barilla was, that none was furnished to her, and that, in consequence of the want of a full cargo, she had not the necessary ballast, and was obliged to go before the wind to St. Thomas, and take in ballast; and that such deviation caused a delay of forty days, and a damage of $1,000. The libel claimed $100 in gold, freight on the 20 pipes of wine. at $5 per pipe. $900 in gold, as compensation in lieu of freight on 150 tons of barilla, at $6 per ton, and $1,000 for the damage by the deviation to St. Thomas. The defence set up in the answer was, that the respondent was ready to put the barilla on board, but the vessel refused to take it, the refusal consisting in the fact that the vessel had not such a clean bill of health as the authorities at the Canary Islands required, and was therefore prohibited by the authorities from taking on board the barilla; that the respondent was not liable for any damage caused by the deviation to St. Thomas; that, through negligence on the part of the vessel, some of the lumber carried outward was lost, and the arrival of the rest was delayed; that the respondent was entitled to recover from the libellants $2.500 as damages for loss of profits on the barilla, and for loss of market for and profits on lumber, caused by the delay in its arrival, and for loss of lumber, and otherwise; and that

the respondent was not liable for any sum to the libellants.

The facts of the case were agreed on by the respective parties, as follows: The schooner was furnished by the Spanish consul at Charleston with a clean bill of health, and started for Palmas with her cargo of lumber. On the voyage, she was obliged, by stress of weather, to put into Newport, Rhode Island, for repairs. From the same cause she lost a part of her deck load of lumber. She remained at Newport for about thirty days. While she was there, and when she left there, the Asiatic cholera prevailed at New York, and at some other places in the United States, but not at Newport or Charleston, nor did it prevail at Charleston when she left there. She went from Newport to Palmas with so much of her outward cargo as had not been lost. The port of Palmas has no harbor, nor has the port of Cabras, hereafter mentioned, in the island of Fuerteventura, but vessels proceeding to those ports come to anchor in a sort of roadstead on the windward side of the island, as near to the shore as possible, and are then loaded by means of lighters, which bring the cargo to them from the shore. The schooner, on her arrival at Palmas, came to anchor at the usual place of anchorage of vessels, and reported to the respondent's agent there, one Wood, who was the consignee of the cargo. Pursuant to the health laws and regulations duly established by the civil authorities of the Canary Islands, such authorities refused to permit the schooner to discharge her cargo, or receive any homeward cargo at Palmas, or hold any communication with the shore, because, as she had last sailed from Newport, a port of a country reported to be infected with Asiatic cholera, such laws and regulations required her to proceed forthwith to the port of Vigo, in Spain, a Spanish quarantine station, and there pass examination, and return to the island, after which, and not till then, she would be permitted to receive her homeward cargo. The master of the schooner refused to go to Vigo, which was distant fifteen or twenty days' sail from the Canary Islands. When the charter party was made, neither of the parties to it knew any thing of the existence of such laws and regulations of quarantine at the Canary Islands. No quarantine station existed at those islands at the time the charter party was made, or at any subsequent time up to the time the schooner finally left there. After some negotiation, the authorities of the island permitted the schooner to unload her outward cargo, and receive on board twenty pipes of wine as part of her homeward cargo. After that, at the request of Wood, she remained at her anchorage at Palmas some six days, to enable Wood to hear from certain correspondents of his, respecting the barilla for the homeward cargo. Wood then directed the schooner to go to the island of

Fuerteventura, where the barilla required for her homeward cargo then was, ready to be laden on board the schooner, and take the same on board, and then proceed direct to New York. She accordingly proceeded to Cabras, the port of Fuerteventura. On arriving there, she made the usual anchorage, and her master communicated with one Hogg, the respondent's agent there. Under the same health laws and regulations, the authorities of the island of Fuerteventura refused to permit the schooner to receive any barilla, or hold any communication with the shore, and for the same reason as at Palmas, unless she would proceed to Vigo, and there pass an examination, and return to Cabras, after which, and not until then, she would be permitted to receive on board the barilla. Both of the islands are subject to the Spanish government. After some fruitless negotiations between Hogg and the authorities, Hogg told the master, that, if he would return to Palmas, he, Hogg, would send over the barilla immediately in lighters. Hogg believed at the time that he would be able to do so, but he subsequently found himself unable to do so, because the authorities, pursuant to such health laws and regulations, interfered and prohibited him from doing so. The schooner thereupon returned to Palmas. At that place, Wood informed the master that the vessel must go forthwith to Vigo, and there quarantine, as required by the authorities, and that, unless she did so, she would not be permitted to receive her homeward cargo. The master refused to go to Vigo with the vessel, and therefore the vessel received no barilla. The master then stipulated that the vessel would go to Vigo, and there go into quarantine, if the charterer would pay the additional expenses to be thus incurred. This stipulation was rejected by Wood. The master then stipulated that he would proceed to St. Thomas, and there fill out the homeward cargo, if Wood, as agent of the charterer, would take upon himself the risk of the loss or gain on such voyage, and the risk of the loss of the vessel by reason of such a deviation from her voyage. This proposal was rejected by Wood, on the ground that he had no authority to accept it. Thereupon the vessel, her lay days named in the charter party having expired, sailed from the Canary Islands for home, without the knowledge or consent of the respondent or his agent. For want of a full cargo, she was short of necessary ballast, and she was obliged to deviate from her direct homeward voyage, to obtain ballast, by which deviation she lost some thirty days, besides being subjected to some additional expense. Freight was paid at Palmas for so much of the outward cargo as was delivered there.

E. D. McCarthy, for libellants.
A. R. Dyett, for respondent.

BLATCHFORD, District Judge. The principal question contested in this case is, whether the respondent is liable for dead freight, or damages in lieu of freight, on the barilla called for in the charter party. It is contended, on the part of the libellants, that the health regulations of the islands did not suspend, impair, or dissolve the contract; that the vessel was in no fault; that the charterer was in fault in not supplying the barilla; and that the prohibition of the authorities fell on the charterer and not on the vessel. On the part of the respondent it is contended, that it was, by the contract, a condition precedent to the charterer's duty to furnish the barilla, that the vessel should be ready and able to take it on board; that the barilla was ready, and the charterer did every thing which was in his power to do without the concurrence of the vessel; that it was the vessel that was prevented from taking the cargo on board, and not the charterer who was prevented from putting it on board; that the vessel was never in a condition to receive the barilla, and did not perform her part of the charter party, and, therefore, the condition precedent to the liability of the charterer for any omission to put the barilla on board never arose; and that there was no fault on the part of the charterer.

The question involved is one depending entirely on the construction of the contract between the parties. By the contract, the vessel agrees to receive on board the barilla, and the respondent agrees to provide and furnish the barilla to the vessel, in the Canary Islands, the cargo to be received alongside within reach of the vessel's tackles. The only exception or reservation made by the contract in respect to these absolute engagements, is contained in the following clause: "The dangers of the seas and navigation, of every nature and kind, always mutually excepted." There is no exception in regard to the restraints of rules and princes, an exception often inserted in charter parties, and applying solely to the vessel, unless expressly stipulated to be mutual. Blight v. Page, 3 Bos. & P. 295, note; Touteng v. Hubbard, Id. 298; Sjoerds v. Luscombe. 16 East, 201, 206; Bruce v. Nicolopulo, 24 Law J. Exch. pt. 2, p. 321; Duff v. Lawrence, 3 Johns. Cas. 167. Therefore, in the present case, there was an absolute engagement on the part of the vessel to receive on board the barilla, even though the authorities of the Canary Islands should prohibit its being put on board. Such prohibition did not dissolve the contract, nor can it absolutely excuse a nonperformance of it. Where a party, by his own contract, creates a duty or charge upon himself, he is bound to make it good, notwithstanding any accident by inevitable necessity, because he might have provided against it by his contract. Blight v. Page, above cited; Hadley v. Clarke, 8 Term R.

259, 267; Spence v. Chodwick, 10 Q. B. 530; Medeiros v. Hill, 8 Bing. 231. The libellants might have inserted in the charter party a provision exempting them from being obliged to perform its covenants if restrained by rulers or princes. But there is no such provision. There was, however, a restraint by the authorities of the Canary Islands against shipping the barilla, and the question is, whether such restraint shall fall on the vessel or on the charterer. The charter party not having provided that the restraint should not, in any event, fall on the vessel, the only proper question for determination in this suit is, whether there was any such default on the part of the charterer as makes him responsible for the failure to load the barilla. The restraint was not one against the exportation of barilla generally, as in Blight v. Page, above cited, where the charterer was held liable. In that case, the charter party contained an exception in regard to the restraints of rulers and princes, and the exportation of barley generally, which was to be the homeward cargo, was prohibited by the authorities of the place of exportation. So, also, in Sjoerds v. Luscombe, above cited, where the charterer was held liable, the charter party contained an exception in regard to the restraints of rulers and princes, which the court held operated as an excuse only for the shipowner, and the loading of the homeward cargo contracted for was prevented by an embargo on all shipping. In Barker v. Hodgson, 3 Maule & S. 267, where the charterer was held liable, a pestilence broke out at Gibraltar, where the homeward cargo was to be laden on board, and, for that reason, the lading of the cargo was prohibited by law, and the decision of the court was placed on the ground that thereby the charterer was prevented from furnishing the cargo. In the present case, there was no general prohibition of the exportation of barilla, no embargo on all shipping, no pestilence at the place of loading, and nothing which prevented the charterer from furnishing barilla to a proper vessel. It is agreed that the cargo of barilla was at the island of Fuerteventura, ready to be laden. but the authorities refused to permit this particular vessel to receive it, because she had not properly quarantined at Vigo. In the absence of any clause exempting the vessel from liability because of the restraints of rulers and princes, I think the fault was hers in not being in a condition to receive the barilla, and that her owners and not the charterer must bear the loss. Ogden v. Graham, 31 Law J., Q. B., pt. 2, p. 29; Spence v. Chodwick, 10 Q. B. 528; Brooks v. Minturn, 1 Cal. 484. The case is unlike that of Morgan v. Ins. Co. of North America, 4 Dall. [4 U. S.] 455. There it was held that the vessel had been in no fault. She took goods at Philadelphia on freight for Surinam, when there was an open commerce between the two ports.

When she arrived at Surinam, the authorities would not permit the cargo to be landed. The prohibition did not rest upon any thing in the character or status of the vessel. The court held that the obtaining permission to land the cargo was the business of the consignee, and that the freight was earned although the cargo was not delivered. The prohibition was like the embargo in Sjoerds v. Luscombe. But, in the present case, the difficulty was with the vessel. She was never in a condition to receive the cargo, because she had failed to comply with the health laws and regulations of the islands. Upon the agreed facts, I can perceive no well founded legal difference between the present attitude of the vessel, and her attitude if she had refused to submit to a lawful quarantine at Palmas, and had, therefore, left without the homeward cargo which she contracted to carry. The true rule is, I think, laid down in Duff v. Lawrence, 3 Johns. Cas. 164, 165. It is that where the owners of a vessel agrees to carry and deliver goods, unless prevented by some of the impediments mentioned in the charter party, many occurrences may take place, and loss or injury arise, in consequence thereof, which were not in contemplation of the parties at the time the charter party was entered into, and, of course, not provided for, and which must be borne by them respectively as it shall happen to fall; and that damage sustained in consequence of the vessel being obliged to perform quarantine, ought to be borne by the owner of the vessel, for it is a temporary prohibition, in no manner provided for in the contract, and which the shipowner ought to submit to, without prejudice to the charterer.

It is claimed by the libellants that, even though the vessel was under an obligation to go to Vigo, the conduct of the charterer's agents at the islands amounted to a waiver of the performance of that obligation. It is alleged that it was the duty of the agent of the charterer, when the vessel arrived at Palmas, to have refused to accept the cargo she carried, or to attempt to supply her with any return cargo, until she had gone to Vigo and quarantined, if the plea now set up in defence was to be made. But I cannot concur in this view. The vessel was bound by the contract to go to both Palmas and Cabras, and her return from the latter port to the former was the result of a mutual arrangement between the master and Hogg, made in good faith on both sides, aside from the charter party. The master was under no obligation to return to Palmas. He might properly have refused to do so, and have gone directly from Cabras to Vigo. The agreed facts show that the charterer's agent always insisted, up to the very last, that the vessel should go to Vigo, and never waived the performance, by the vessel, of her obligation to go there. Nor can the acceptance of the lumber, or the loading of the wine, excuse the failure of the vessel to put herself in a condition to receive the barilla.

It follows, therefore, that the libellants are not entitled to dead freight, or damages in lieu of freight, on the barilla. Nor are they entitled to damages for loss of time, or expenses incurred by the deviation to St. Thomas on the homeward voyage, as the deviation was not caused by any act or omission of the respondent.

I do not see how the respondent can refuse to pay the freight on the wine, after having accepted it. His agreement is to pay so much per one thousand feet freight on the lumber, on its delivery at the islands, and so much per ton freight on the barilla, and per pipe freight on the wine, on proper delivery. When the lumber was delivered, the freight on it was paid. This is a practical construction of the contract by the respondent. Freight is to be paid, at the agreed rate, on whatever cargo is delivered. Freight is due on the wine, although no barilla was brought. Indeed, the answer does not set up that freight was not earned on the wine. The effect of the answer, in this respect, is merely to claim damages to an extent sufficient to absorb any claim of the libellants. The respondent is entitled to set off or recoup against the freight due to the libellants on the wine, any damage set up in the answer, which he can prove to have arisen out of any breach of the charter party by the libellants, to the extent of the freight, but, for any claim beyond that, the respondent must resort to his own proper action. Zerega v. Poppe [Case No. 18,213]; Thatcher v. McCulloh [Id. 13,862]; Bradstreet v. Heran [Id. 1,792]. The freight to which the libellants are entitled, is the sum of $100, with interest from the time the wine was delivered, without reference to the provision of the charter party in regard to gold. A decree will be entered accordingly.