### FALLS OF KELTIE S. S. CO. v. UNITED STATES & AUSTRALASIA S. S. CO.

#### (District Court, S. D. New York. April 13, 1901.)

SHIPPING—CONSTRUCTION OF CHARTER—COVENANT FOR DOCKING—DAMAGES FOR DELAY OCCASIONED BY FOUL BOTTOM.

A charter of a steamship for a period of about six months, hire to continue until her redelivery at some designated port, contained a provision that "steamer is to be docked, bottom cleaned, and painted whenever charterers and master think necessary, at least once in every six months, and payment of the hire to be suspended until she is again in proper state for the service." At the expiration of six months the ship was in a South African port, and the charterer desired to bring her to the United States for redelivery. She had not been docked or cleaned during the term of the charter, and the charterer demanded that she be taken to Cape Town and docked. The owner refused, and the ship was delayed on the passage home on account of the foul condition of her bottom. *Held*, that the charter provision was, in legal effect, an absolute engagement on the part of the owner to have her docked and cleaned at least once in six months, or else to allow the charterer his actual loss resulting from the failure, and that such provision continued in force so long as

the hire continued; that neither the fact that the master did not deem the docking necessary nor that she could not be docked at Cape Town released the owner from such engagement.

In Admiralty. Suit to recover charter hire.

Convers & Kirlin, for libelant.
Wing, Putnam & Burlingham, for respondent.

BROWN, District Judge.   The parties having agreed upon the amount of charter hire, the only question presented to the court for decision, is as to the amount to be allowed as a counterclaim, if any, on account of the delay in the passage of the steamship Falls of Keltie from Port Elizabeth, South Africa, to Norfolk, Va., in July and August, 1900.   The charter was for "a period of about six months with charterer's option of about nine or twelve months between New York and Cape Verde Islands, South African ports, Australian ports, etc., etc. and U. S. ports north of Hatteras. * * * Hire to continue until her delivery at the U. K. * * * or U. S. port north of Hatteras."

The charterer did not exercise his option of continuing the hire of the vessel for the further period of three or six months; but at the expiration of the six months, namely, on June 6, 1900, she was in the hands of a subcharterer at Algoa Bay, also called Port Elizabeth, South Africa, with a cargo consigned to the British government. She arrived there on April 19th, where she occupied a period of 10 weeks in discharging, which extended beyond the 6 months period. The charterer and subcharterer retained her only for the purpose of completing the discharge and returning, and the provision of the charter that hire should continue until redelivery, etc., became applicable, together with the other provisions of the charter, until the return could be properly effected.

Clause 22 of the charter, upon which the counterclaim is based, is as follows:

"That as the steamer may be found from time to time employed in tropical waters during the term of this charter, steamer is to be docked, bottom cleaned and painted whenever charterers and master think necessary, at least once in every six months, and payment of the hire to be suspended until she is again in proper state for the service."

On account of the steamer's foul bottom, the respondent on June 26th, pursuant to this clause, demanded that the steamship should be dry-docked at Cape Town, which was the nearest accessible dry dock, but was distant two days' sail.   On July 2d the owners by cable refused to dry-dock at Cape Town, adding, "Captain reports it is not necessary."   On July 11th the steamship sailed from Algoa Bay and arrived at Norfolk on August 27th, after a passage of 46 days.   The respondent claims that by reason of the foul bottom the time of her homeward passage was increased from 6 to 12 days, and that for that reason the respondent should be allowed a deduction from the charter hire for that period, as well as for the extra coal consumed during that time at the price it cost at Algoa Bay.

For the owners it is urged that dry-docking at Cape Town was practically out of the question and was not obligatory, not only on

108 F.—27

account of its distance of two days' sail from Algoa Bay, but because the dry dock there was so occupied that it could not be availed of; and further, that the owners were not bound to dry-dock the vessel for the charterer's benefit after the expiration of the six months period, merely to facilitate her return passage and diminish the charterer's responsibility for charter hire.

On this point I cannot sustain the owners' contention. The agreement in the charter, as I construe it, was an absolute and unqualified agreement that the steamer should be docked "at least once in every six months, and the payment of the hire to be suspended until she was again in proper state for the service."

This provision, as I read it, is altogether independent of what the "master may think necessary." Should the charterer and master think necessary a more frequent cleaning than once in six months, then the prior clause made the more frequent cleaning obligatory; but in any event the steamer was to be dry-docked at least once in every six months. The charter continued, and the charter hire continued, so long as the charterer continued to use the vessel lawfully in accordance with the provisions of the charter. The charterer could not escape paying the hire until redelivery according to the charter; and hence the owner's reciprocal covenant to dock the steamer for the purpose of keeping her bottom clean continued in full force and was obligatory so long as the owner's right to payment continued, and the charterer's obligation to pay. The object of cleaning was to expedite the vessel on all her various passages and to relieve the charterer from the additional charter hire arising from delay through a foul bottom; and I see no reason why the covenant for this purpose should not be applied to the passage home, as much as to any other of the steamer's voyages. Nor is it any defense to this counterclaim for deduction that dry-docking at Cape Town was not practicable. That might be a good answer to a claim for a specific performance, but not to a claim for the actual damage sustained by the respondent from the nonperformance of the owner's express covenant. By this unconditional contract the owner took the risk of his inability to perform the contract. Not being occasioned by the act of God, so termed, any actual loss from nonperformance should be borne by the owner, and not by the charterer; since the charterer was entitled by the contract to the advantage of a performance of that stipulation as a part of the consideration for which he had agreed to pay the charter hire. In legal effect, this clause was an agreement either to dry-dock the steamer at least once every six months, or else to allow the charterer his actual loss from failure to clean her. The Harriman, 9 Wall. 161, 172, 19 L. Ed. 629; Navigation Co. v. Hooper, 160 U. S. 514, 16 Sup. Ct. 379, 40 L. Ed. 514; Holyoke v. Depew, 2 Ben. 334, 340, Fed. Cas. No. 6,652; The Spartan (D. C.) 25 Fed. 44, 53.

2. As respects the amount of delay and consequent loss caused by the vessel's foul bottom, the evidence is quite conflicting. There is evidence that after the arrival of the vessel, the secretary and manager of the company in a conversation with the master, claimed that six days would be a fair allowance for the delay; and that while the master attributed his slow passage to currents and the lightness of

the ship, whereby the propeller did not take full hold of the water, he said that he would not interfere with the allowance of six days, and did not know whether that was a fair allowance or not. Other evidence confirms the master's testimony that the extreme lightness of the ship delayed her; and the charterer for its own benefit and to save itself expense of getting rid of the sand ballast, five days before arrival threw overboard 250 tons of sand ballast, which had been taken on board for the purpose of giving greater immersion to the propeller, so as to increase her headway. The result of this was still further to diminish her speed during the last five days. Without going into further particulars, on examination of all the evidence upon this point, I am of opinion that five days is a reasonable deduction to be made in the respondent's favor; and that the coal consumed during five days should also be allowed for at the cost price to the ship. The cost price should be allowed, because the charterer was bound to provide coal in view of the steamer's actual condition and the probable length of her voyage; one item of the loss is, therefore, the extra coal necessarily taken for those five days and the actual price the charterer was obliged to pay in order to obtain it.

A decree may be entered accordingly with costs.