MUNSON S. S. LINE v. MIRAMAR S. S. CO., Limited.

(District Court, S. D. New York.   January 24, 1907.)

1. SHIPPING—TIME CHARTER—LIABILITY OF OWNER FOR TIME LOST THROUGH DEFECTIVE WINCHES.

Where a time charter of a steamer required her to be in every way fitted for the service and to have steam winches, which were to be at the charterer's disposal, the charterer is entitled to an allowance for delay in discharging due to the defective condition of the winches or deficiency in steam power for operating them.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 44, Shipping, § 195 ]

2. SAME—CONSTRUCTION OF CHARTER PARTY—PROVISION FOR DOCKING.

Under a provision in a time charter party of a steamer that she should be docked and cleaned "whenever charterers and master think necessary, but at least once in every six months," during which time the

charter hire was to be suspended, the charterer is entitled to have, her so docked at the expiration of six months from the last prior docking, although that was previous to the charter, and regardless of her actual condition; it being shown that there was a general custom to interpret such provision as making the six months begin to run from the time of the last docking, irrespective of the time when the charter went into effect.

In Admiralty.

Wheeler, Cortis & Haight, for libellant.

Convers & Kirlin and Charles R. Hickox, for respondent.

ADAMS, District Judge. This action was brought by the Munson Steamship Line against the Miramar Steamship Company, Limited, to recover several items alleged to be due under a charter party of the said steamship, dated October 3, 1902, for a period of six months under which she was delivered to the libellant on the 28th day of January, 1903, at 11 A. M. and was duly re-delivered by the libellant to the respondent on the 7th day of August, 1903, at 2 P. M. It is alleged that by reason of the unfit condition of the winches and donkey engines of the steamer or through a lack of steam which the respondent was required to furnish, the steamer was delayed at the port of Matanzas during the month of May, 1903, for two days longer than the time customarily required for the discharge of cargo and the libellant is entitled to reimbursement therefor, the hire having been paid in advance; it is further alleged that through the same conditions she was also delayed at the port of New York during the month of June for three days longer than the time customarily required for discharging and that the libellant is also entitled to reimbursement therefor. Altogether the hire claim is for $542.97. There is an additional claim involved in the action for 2 days 22½ hours, hire from 1:30 P. M. July 10th until noon of July 14th, during which it is alleged that the ship remained idle under the dry docking clause in the contract, amounting to $310.27. The validity of all these claims is denied by the respondent.

The claim for delay through the condition of winches and donkey engines.

The contract provided with reference to these matters:

"1. That the owner shall provide and pay for all provisions, wages, and Consular shipping and discharging fees of the Captain, Officers, Engineers, Firemen and Crew; shall pay for the insurance of the vessel, also for all the cabin, deck, engine room, and other necessary stores, and maintain her in a thoroughly efficient state in hull and machinery for and during the service.

2. That the Charterers shall provide and pay for all the coals, Fuel, Port Charges, Pilotages, Agencies, Commissions, Consular Charges (except those pertaining to the captain, officers or crew), and all other Charges whatsoever, except those before stated.

23. Steamer to work night and day if required by Charterers, and all steam winches to be at Charterer's disposal during loading and discharging, and steamer to provide men to work same both day and night as required, Charterers agree to pay for all night work, at the current local rate."

It also provided that the vessel should on delivery to the charterer be "ready to receive cargo, and tight, staunch and in every way fitted for the service * * * having * * * steam winches and don-

key boiler, * * * and to be so maintained during the continuation of this Charter Party to be employed in carrying lawful merchandise between safe ports in the United States and or West Indies. * * *"

There has been considerable testimony taken by both sides in this matter but a study of the evidence has convinced me that the charterer's contention is right. There was delay both at Matanzas and New York in the discharging. Most of the testimony relates to the discharging in New York but that relating to the condition of the winches is applicable to both places.

It appears that the vessel in May, 1903, was discharging a cargo of coal and coke at Matanzas and complaints were then made by the charterer's agents there, based upon the slow discharging, owing, it was claimed, to a deficiency in the steam power of the winches. The officers of the steamer claimed that there was no such deficiency and that the trouble arose from the barrels of the winches having been increased in diameter by the charterer for the purpose of accelerating the discharge and hence required more than the usual quantity of steam to run them. If the increase in the size of the winch drums was necessitated, as seems to be the fact, by the condition of the winches with respect to their ability to work with customary rapidity, then such increase should be charged to the vessel, and not be made the basis of a complaint against the charterer. It was not perfectly clear from the testimony concerning the matter at Matanzas that the vessel was in fault but a great deal of light was thrown upon the matter by subsequent events. In June the steamer came to New York to discharge a cargo of sugar and the trouble was then fully investigated.

The quantity the steamer should have delivered in New York was at least 5,000 bags per day. Her actual delivery was as follows:

| June | 5, 1903 | ........................................................ | 3,411 | sacks |
|------|---------|----|-------|-------|
| "    | 6, "    | | 3.373 | " |
| "    | 8, "    | | 3,566 | " |
| "    | 9, "    | | 3,892 | " |
| "    | 10, "   | | 2,028 | " |
| "    | 11, "   | | 4,098 | " |
| "    | 12, "   | | 1,493 | " |
| "    | 13, "   | | 1,133 | " |
|      |         | | 22,994 | |

It appears that, on account of the condition of the winches, the delivery was very slow even at this rate of discharge, which is only about two-thirds of the quantity that steamers often deliver at this place but it is admitted by the libellant's witnesses that 5,000 bags per day would have met the customary requirements and been a performance of the steamer's duty. Proceeding upon that basis, still there was apparently a considerable deficiency, perhaps accounted for partly by some excusable delay.

It has been attempted by the steamer to account for some part of the delay by alleging the use of a poor quality of coal but it appears that the coal furnished by the charterer was of the ordinary commercial quality and was not open to just criticism.

The testimony in New York shows that the winches were so much out of order, that at times they would not run at all and upon com-

plaints slight repairs were made by "screwing up a bolt here and there." It was also said that there was not sufficient steam to work the winches, sometimes not power enough to lift the bags out of the hold; at one time there was a delay of three hours for that reason. Another witness said that he complained to the master of the slow discharge and he said that the donkey boiler was doing all that was possible and that he could not supply steam from the main boiler. A survey was called to ascertain the facts and one man was appointed by the charterer and two by the steamer. An examination was made, particularly by the former, and he found that the winches were deficient in power excepting when steam was surreptitiously supplied to them from the main boiler, in addition to what the donkey boiler could furnish, and even when steam was taken from the main boiler, the winches while they did the work, were not in condition because the steam was blowing away, indicating defective pistons and slide valves.

I think there is no doubt that there was a deficiency of steam and the winches were out of order. It seems clear that the libellant is entitled to some recovery for the time lost in consequence thereof. The respondent contends that the winches did the work and there was no time lost. This claim is rejected but the matter is one of detail and the extent of recovery proper for the consideration of a commissioner.

The claim for loss of time while the ship remained idle awaiting dry docking.

The provision of the charter in this connection was:

"21. That as the steamer may be from time to time employed in tropical waters during the term of this charter, steamer is to be docked, bottom cleaned and painted whenever Charterers and Master think necessary, but at least once in every six months, and payment of the hire to be suspended until she is again in proper state for the service."

The facts seem to be that the vessel was last docked, prior to going into the charterer's service, on the 23rd of December, 1902, and consequently on the 23rd of June, 1903, had been out of dock six months. On the 11th of July, 1903, the charterer made a demand that the vessel be docked under this clause. The owner refused and hence this controversy.

The vessel apparently did not greatly need docking, having been a number of times during the charter in fresh water, which has a tendency to clean the bottom of any growth or foulness, but the contract was that the vessel should dock at least once in every six months. It is claimed here that the docking was not necessary but that seems to be immaterial under the contract.

A somewhat similar contention arose in the Falls of Keltie S. S. Co. v. United States & Australasia S. S. Co. (D. C.) 108 Fed. 416. Judge Brown there said (page 418):

"The agreement in the charter, as I construe it, was an absolute and unqualified agreement that the steamer should be docked 'at least once in every six months, and the payment of the hire to be suspended until she was again in proper state for the service.'

This provision, as I read it, is altogether independent of what the 'master may think necessary.' Should the charterer and master think necessary a more frequent cleaning than once in six months, then the prior clause made the more frequent cleaning obligatory; but in every event the steamer was

to be dry-docked at least once in every six months. The charter continued, and the charter hire continued, so long as the charterer continued to use the vessel lawfully in accordance with the provisions of the charter. The charterer could not escape paying the hire until redelivery according to the charter; and hence the owner's reciprocal covenant to dock the steamer for the purpose of keeping her bottom clean continued in full force and was obligatory so long as the owner's right to payment continued, and the charterer's obligation to pay. The object of cleaning was to expedite the vessel on all her various passages and to relieve the charterer from the additional charter hire arising from delay through a foul bottom; and I see no reason why the covenant for this purpose should not be applied to the passage home, as much as to any other of the steamer's voyages."

The only real question here is, could the charterer at substantially the probable termination of its contract, require the vessel to dock. The matter has been warmly contested, the owner asserting that there is no merit in the charterer's claim because the vessel did not need docking at the time, and the charterer did not have any further business for the vessel and did not wish to send her on another trip but simply to use this claim to get the master to admit the charterer's claim about the winches. The charterer, on the other hand, contends that the docking matter is one which stands alone; that the time necessary for docking actually belongs to it under the contract and that the demand therefor was made in good faith as at the time the demand was made it had not been determined that the charter would shortly expire, but even if there had been no option of renewal, there is no reason for charging the charterer with bad faith.

The treasurer of the charterer testified:

"This controversy occurred about the 11th of July, the captain on the day when I wrote this letter being in Philadelphia, and I had a conversation with him if I remember correctly over the telephone. As I remember my proposition was in reply to his statement that the hardship was being worked on his owners by having this vessel dry docked when the completion of the charter was very approximate and if I remember correctly I suggested to him that if he, acting for his owners, would acknowledge and pay our claims for the dispute about the winches in New York on a previous voyage that I might waive that dry docking this time and allow him as an accommodation to make another voyage. I think also that I intimated to him that if his owners thought it was a hardship to dock the ship now that I would consider terminating the charter at that moment if his owners so preferred instead of forcing her to the dry dock so near the end of the charter."

The question is one of the technical rights of the parties, i. e., whether the charterer was entitled to have the vessel docked within its time at substantially the termination of the contract.

The language would have been plain enough if the vessel had been in the charterer's employ six months at the time of the demand under the words of the contract, which state that the parties may agree for a docking at any time but in any event, it must take place at least once in every six months. That leaves the only question, whether the fact that the last docking took place prior to the contract had any effect upon the matter. The language would seem to imply that it was intended that the docking should take place at the expiration of six months from the previous docking but any doubt upon such a point is resolved by the testimony which establishes a general custom in the interpretation of the clause requiring the vessel to dock every six months if required

by charterer and that the time begins to run from her last docking and is irrespective of the time the charter party goes into effect.

Such seems to be conclusive of this contention. The charterer is entitled to recover the time that docking would have required.

Decree for the libellant, with an order of reference.