NOYES v. MUNSON S. S. LINE.

(District Court, S. D. New York. November 11, 1909.)

SHIPPING (§§ 49, 62*)—CLAIM FOR CHARTER HIRE—DEDUCTIONS.
    *Held* that the charterer was entitled to deduct (1) for quarantine detention, (2) advances to the master, (3) loss of time while awaiting dry

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

docking, and (4) for a compromise with the master with respect to time lost through defective winches.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 195, 258, 259; Dec. Dig. §§ 49, 62.*

Deductions and offsets from charter hire of vessel, see note to Tweedie Trading Co. v. George D. Emery Co., 84 C. C. A. 254.]

(Syllabus by the Judge.)

In Admiralty. Action by the Munson Steamship Line against Winchester Noyes. Libel dismissed.

Convers & Kirlin, for libellant.

Wheeler, Cortis & Haight, for respondent.

ADAMS, District Judge. Winchester Noyes claims the recovery in this action from the Munson Line of unpaid hire, amounting to $1,064.84, of the steamer Dorisbrook, under charter dated October 3, 1904. The contract of hiring was covered by the usual form of time charter. The respondent, after sundry denials, alleges:

"Fourteenth: Further answering the libel, the respondent alleges that the charter of the steamship Dorisbrook contained, among others, the following provisions:

'Steamer to be placed at the disposal of the charterers at New York * * * being on her delivery ready to receive cargo, and tight, staunch, strong, and in every way fitted for the service, having water ballast, steam winches and donkey boiler with capacity to run all the steam winches at one and the same time and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage, * * * to be employed in carrying lawful merchandise * * * in such lawful trade as mentioned above, as the charterers or their agents shall direct, on the following conditions:

1. That the owner shall * * * maintain her in a thoroughly efficient state in hull and machinery for and during the service.

2. That the charterers shall provide and pay for all * * * Consular charges (except those pertaining to the captain, officers and crew). * * *

16. That in the event of loss of time from deficiency of men or stores, breakdown of machinery, stranding, or damage preventing the working of the vessel for more than 24 consecutive hours, the payment of hire shall cease until she be again in an efficient state to resume her service. * * *

17. * * * The act of God, enemies, fire, restraint of rulers, princes and people * * * throughout this charter party mutually excepted.

22. That as the steamer may be from time to time employed in tropical waters during the term of this Charter, steamer is to be docked, bottom cleaned and painted whenever Charterers and Master think necessary, at least once in every six months, and payment of the hire to be suspended until she is again in proper state for the service.'

Fifteenth: At the port of Mobile the steamship Dorisbrook, during said charter, was delayed by reason of sickness among the crew, rendering them unfit for service, from the 13th day of August, 1905, at 4:30 P. M. to the 16th day of August, 1905, at 1:30 P. M., or 2 days and 21 hours, which, at the charter rate of hire, amounted to $383.70. Said sickness among the crew was such as to result in a 'deficiency of men' for the proper working of the steamship, and a restraint of princes, rulers and people within the provisions of the charter above quoted.

Sixteenth: While the said steamship Dorisbrook was on the said charter, she consumed for owner's account 18 tons of bunker coal, belonging to the respondent, of the value of $117.00, for which amount respondent is entitled to make a deduction from charter hire. The respondent also made advances to the master of the said steamship Dorisbrook for the libellant which constituted payment of the charter hire in advance up to the time of the steam-

ship's redelivery at the end of the charter, amounting in all to the sum of $207.46.

Seventeenth: In accordance with the provisions of clause 22 of said charter, and after the steamship Dorisbrook had been employed in tropical waters for over 6 months, since her last docking, said steamship was duly tendered to the owners by the libellant on the 10th day of August, 1908. at 5 P. M. for the purpose of dry docking and painting. The owners, however, refused to dock said steamer at that time, and pending said refusal, the vessel lay idle up to the time she went off charter on the 13th day of August, 1906, at 9 A. M. and by reason of said owners' refusal to dock, respondent is entitled to reimbursement for said 2 days and 16 hours, which at the charter rate of hire amounted to $385.92.

Eighteenth: On or about the 12th day of December, 1905, the steamship Dorisbrook arrived at the port of New York with cargo, and the respondent immediately sent her to a berth to discharge. By reason of the fact that upon arrival her winches were broken and out of repair, it was impossible to use the same, except to a very small extent, in the discharge of said cargo, and four of said winches were so far disabled as to be utterly useless during said discharge, which was completed on or about December 16, 1905. Because of the condition of the winches, as aforesaid, the time occupied in said discharge was prolonged by one day, for which the respondent is entitled to compensation in the sum of $135, which sum is the value of one day at the charter rate. By reason of the condition of the winches aforesaid, the respondent was further necessarily put to extra expense for the hiring of hoisters and derricks to take the place of the said winches, and for extra labor caused by the condition of the winches aforesaid, in the sum of $102, for which the respondent is entitled to reimbursement. Said sums of $135 and $102 make a total of $237, which was properly deductible by the respondent from the charter hire.

Nineteenth: By reason of the premises the respondent became entitled to deduct from the charter hire otherwise due on said steamship the said sum of $383.70, $117, $207.46, $385.92 and $237, and therefore the sum claimed in the libel was properly deducted from said hire as aforesaid."

The cited provisions of the charter party are correctly quoted, in substance.

1. The first deduction claimed is for detention at Mobile, amounting to $383.70.

It appears that the steamer went into quarantine at Mobile, Alabama, the 13th of August, 1905, at 4:30 p. m., and remained until the 16th at 2 p. m. When she arrived she went to the quarantine hulk and was fumigated, then went to anchor and was detained by the authorities from 4:45 p. m. the 13th until 2 p. m. the 16th on account of the illness of the crew on board. During this time the crew were physically able to move the vessel, but they were held as "suspects" and were thus constructively inefficient. In Tweedie v. Emery (D. C.) 146 Fed. 618, affirmed 154 Fed. 472, 84 C. C. A. 253, there was detention owing to sickness of the crew, which was deemed a legal cause for deducting the loss of time. In that case, there was a new crew substituted, and the vessel was then released. There was no substitution here but the vessel in such sense remained helpless. The cases are not distinguishable by reason of the following language of the Court of Appeals, viz.:

"It is to be noted that this is not a case where some of the crew falling sick, enough are left to bring her forward on her voyage."

Here the ship was actually helpless and could not avoid detention during the claimed time. The Circuit Court of Appeals has quite re-

cently again considered and affirmed the doctrine of the Emery Case in Gow v. Gans S. S. Line, 174 Fed. 215, under similar provisions in the contract. The language just quoted was the basis of a decision by Judge Holt to the effect that there could be no recovery for such detention in quarantine but the decision was reversed and the court said:

"We have held in the case of Tweedie Trading Co. v. George V. Emery Co., 154 Fed. 472, 84 C. C. A. 253, that a deficiency of men may be constructive, e. g., inability to work because of quarantine regulations, and in Clyde Commercial Steamship Co. v. West India Steamship Co. (C. C. A.) 169 Fed. 275, that a distinction between the vessel and her crew may be made for quarantine purposes. Such a distinction appears in the regulations under consideration. Under 68 (b), 68 (c), 74 and 104 a vessel may be rendered free from infection by fumigation and released if a new crew be furnished, otherwise she may be detained for five days longer for the purpose of observation of the personnel. The fumigation of this vessel was completed September 11 at 4 P. M. and the subsequent detention of five days was due entirely to the personnel. There was, therefore, a constructive deficiency of men within Art. 16 of the charter, which expressly causes hire to cease for that time. The exception in Art. 17 of the restraint of princes, rulers and people does not apply to the categories mentioned in Art. 16, as we have held in the case of the Clyde Commercial Steamship Co., supra."

2. The next deduction claimed, $207.46, is that made to the master for provisions, etc.

Bills for these disbursements have been approved by the master. There is no real dispute about these items.

3. The next deduction claimed, $385.92, is for time lost while awaiting dry docking.

On the 11th of August, 1906, the respondent gave the libellant notice that the steamer would be in its hands for dry docking. This was duly acknowledged by the master, who replied as follows:

"In reply to your letter of yesterday I beg to advise you that I cannot accept delivery of my steamer for dry docking purposes as you request.

As per your instructions my owners were notified on August 7th that my steamer would be re-delivered to them in New York on August 13th, in view of which fact, they were aware that you were not going to use my steamer for another trip, and therefore cabled me on August 9th not to dry dock again while under your charter.

As advised you, I had received a cable from owners previously on August 4th, agreeing to dock and paint, but at that time they were no doubt under the impression that I was to go on another voyage.

I, therefore, under the circumstances, must formally decline to accept redelivery from you for docking purposes, and must ask you to retain my steamer under hire until expiration of charter party on Aug. 13th."

The vessel was actually discharged at 4:30 p. m. on that day. She had been last dry docked December 18, 1905. The libellant refused to dry dock her for the next two days but as soon as she was re-delivered, she was sent to be dry docked.

In this case, therefore, there was an actual necessity for dry docking and it was no answer to a demand for the necessary time to allege that the vessel did not need dry docking. Assuming the correctness of the claimant's contention, still the owner was bound to pay for the time lost, even if it was not actually necessary for the purpose. Munson S. S. Line v. Miramar S. S. Co. (D. C.) 150 Fed. 437, affirmed 166 Fed. 722, 92 C. C. A. 412; (C. C. A.) 167 Fed. 960.

4. The next deduction claimed, $237, was on account of defective winches.

When the steamer arrived in New York December 12, 1905, her winches were badly broken, three of them could not be used at all, and one of them could only be used in part. The engineer testified that on a voyage from Progresso to Staten Island, on December 9th, "* * * everything broke adrift, smashed up." The deck cargo, mahogany logs, "broke adrift and broke the winches, at least the deck winches. * * * On Sunday morning No. 4 winch badly broken by loose logs, 12:30: both frames of No. 4 winch broken. * * *" The cargo was discharged. "Some of it was by winches and some of it was by steam hoisting gear that came alongside—using the poop winch and the middle winch and the fore winch. * * * Q. So what winches were there that could not be used? A. No. 2, No. 3, and No. 4. * * * No. 4 was absolutely in pieces. * * * Q. When you arrived in New York on December 12 how many winches were there out of repair? A. Three. Q. Weren't there four? A. Well when we arrived for them to start cargo there were only three. There were four when we arrived, but we fixed No. 1 for them the next morning. Q. When you arrived four were in such condition you could not work them? A. They were broken. Q. How many winches have you in all upon the vessel? A. Six. * * * There were only two winches that were not touched—the bridge deck winch and the poop winch."

Under the circumstances, the master and the charterer entered into an agreement to have a steam hoister assist in the discharge, the charterer agreeing to pay hire and the owner to stand the extra expense of discharging, caused by the defective condition of the winches. The vessel was thus delayed one day longer than usual, the hire for which period would be $135, and the charterer paid for hoisting and extra labor $102. This made $237, for which the master approved a voucher.

The master, it is urged, exceeded his authority in making this agreement, as it was contrary to the charter party. This was perhaps true, unless the master was, under the circumstances, justified in compromising the matter. The ship would have been liable for lost time while she was out of condition for work (The Munson S. S. Line v. Miramar S. S. Co., supra), and it was undoubtedly for her benefit that an adjustment should be reached as soon as practicable. It seems to me that the master adopted a wise course in preventing delay.

In The Edward H. Blake, 92 Fed. 202, 34 C. C. A. 297, a dispute as to the meaning of "a small quantity of oak ties" was compromised by the master. It was held, as stated in the syllabus:

"While a master has no power to set aside the contract made by the charter party, yet where, at the time of loading, questions arise between the ship and the charterer as to the proper construction of minor clauses in the contract, in the absence of the owners, the master, as their agent, must necessarily deal with the same, and his construction and agreements in relation thereto are binding on the owners."

I have no doubt that the master, under the circumstances of this case, was justified in making a settlement for the benefit of the vessel, and the wisdom of his action here is apparent when it appears that it

would have been much more expensive if the master had stood strictly on his authority as master, in which event, the vessel would have been liable for a larger amount than she paid here. See Lake Steam Shipping Co. v. Bacon (D. C.) 129 Fed. 819, affirmed 145 Fed. 1022, 74 C. C. A. 476.

The respondent has proved more than necessary and the libel is dismissed.