### DAMPSKIBSACTIESSELSKABET URANIA v. BARBER & CO., Inc.

(District Court, S. D. New York.   February 2, 1910.)

(*Syllabus by the Judge.*)

SHIPPING (§ 49*)—RIGHTS OF CHARTERER—COMPENSATION TO WINCHMEN.
    Claims for compensation paid for winchmen outside of the vessel's crew at New York and Buenos Ayres. *Held* that the time charterer was entitled, under the testimony that the master of the vessel had consented to the use of outside men to run the winches at New York, to offset the amounts paid against the charter hire, but not at Buenos Ayres as proof was lacking to support its claim in that respect.
    [Ed. Note.—For other cases, see Shipping, Dec. Dig. § 49.*]

Action by the Dampskibsactiesselskabet Urania against Barber & Co., Incorporated.   Decree for libellant, with interest.

Convers & Kirlin, for libellant.

Hunt, Hill & Betts, for respondent.

ADAMS, District Judge.   This action was brought to recover $616.16, balance of hire of the libellant's steamship Polarstjernen, claimed to be due under the charter party dated March 28, 1905, and alleged to have been wrongfully deducted by the respondent.   The amounts deducted were the wages paid by the respondent for shore winchmen between April 11, 1905, and March 10, 1906, at New York and Buenos Ayres.   The respondent's claim is that the amount of the deductions was properly paid and it was entitled to deduct them from the hire.   The controversy turns upon the provisions of the charter and certain transactions which took place between the parties.

The contract provided:

"1. That the owner shall provide and pay for all the provisions, wages and Consular shipping and discharging fees of the Captain, Officers, Engineers, Firemen and Crew; shall pay for the insurance of the vessel, also for all the cabin, deck, engine room and other necessary stores, and maintain her in a thoroughly efficient state in hull and machinery for and during the service.

2. That the Charterers shall provide and pay for all the Coals for driving engines and winches Port Charges, Pilotages, Agencies, Commissions, Consular Charges, (except those pertaining to the captain, officers or crew), and all other charges whatsoever, except those before stated."

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

"13. That in the event of loss of time from deficiency of men or stores,

strikes, stoppage of labor, break-down or damage of machinery or damage to rudder, or propeller, grounding, detention by average accidents, to ship or cargo, or by other cause preventing the full working of the vessel (including loading and/or discharging cargo), the payment of hire shall cease for the time thereby lost, and if upon the voyage the speed be reduced by a defect in or breakdown of any part of her machinery, damage to her propeller, rudder or by any other mishaps of hull or engines the time so lost and the cost of any extra coal consumed in consequence thereof shall be deducted from the hire."

\* \* \* \* \* \* \* \* \* \* \* \*

"17. Steamer to work night and day as required by charterer, and all steam winches to be at Charterer's disposal during loading and discharging. and Steamer to provide men to work same both day and night as required Charterer agreeing to pay ordinary extra expense if any incurred by reason of night work. In the event of short steam, or a disabled winch or winches, Owners to pay for shore Engine or Engines, in lieu thereof if required and to pay any loss of time occasioned thereby. Coals used for cooking. evaporating water, or for grates and stoves to be agreed as to quantity, and their value allowed by owners.

18. That should the vessel be lost, the hire is to cease and determine on the day of her loss or when last seen, and any hire paid in advance shall be returned to the Charterer at once. Charterer if required to advance the necessary funds for steamer's ordinary disbursements and same to be deducted, together with 2½% for interest and commission from next payment of hire."

1. The first item in dispute is for disbursement of $124.50 for shore winchmen at New York in April, 1905.

Mr. Spillane, the foreman stevedore for the Atlantic Stevedoring Company, testified that before commencing loading he saw the master of the steamer and asked him,

"if he will furnish men or if I will furnish men; I told him he will be responsible in case of any accident if his men were driving the winches and if I am driving them I would be. In this particular case he told me to put my men on. Q. To drive the winches? A. Yes, sir. Q. Did your men drive the winches? A. My men did drive the winches."

He said further that when the loading was completed, he presented the time sheet to the captain for signature. This voucher, showing the number of hours paid for, was offered in evidence by the respondent and contains the captain's and chief officer's signatures. He further said that the master did not furnish winchmen on either of the occasions she was working at New York and that no objection was made by his men to working with winchmen belonging to the ship because they were not members of the Labor Union. On the cross, he said that in loading oil, sometimes he used the ship's men.

Mr. Tiffany, superintendent and manager of a stevedoring company, stated that he remembered having a conversation with the captain of the steamer about winch driving and that:

"I asked Captain Branth about his winches; he said: 'You better put your own men on our winches and instruct the chief officer to keep track of the time. We have plenty of work for our own men, we had a rough passage coming and I need all the men—and some are going to leave—to paint and get the ship up in shape."

He further said:

"Q. These vouchers that have been offered in evidence and the time sheets, are they the customary papers that are handed up for signature by the master? A. They are the vouchers that we use for the chief officer's signature for approval with regard to the number of hours before they are submitted to the

captain of the ship. Q. How do you get your payment after you get those vouchers from the master and mate? A. From the different agents that we work for. Q. You hand them the vouchers and get the payment? A. We attach them to our bills. Q. Did the Atlantic Stevedoring Company have its own time keeper on the jobs that were done on the Polarstjernen? A. We have a separate time keeper on all ships."

\* \* \* \* \* \* \* \* \* \*

"Q. Was there any need for you, yourself, to have this time sheet in order to know how many hours your men put in on the vessel? A. Certainly, to make out our bill by it. Q. Did you have a copy of the time sheet? A. We had a copy of the time sheet."

\* \* \* \* \* \* \* \* \* \*

"Q. What do you say as to whether or not on some occasions the ship's winchmen do run the winches? A. We have had men knock off on occasions where the ship's winchmen are not capable of running them; very often the gang refuse to work being in danger of getting hurt."

Mr. Murphy, foreman for the Atlantic Stevedoring Company, said he heard the captain and Mr. Spillane speaking about winch driving and that the captain said:

"Go ahead and put on your own winchmen."

He further said, on cross-examination:

"Q. Who generally runs the winches in New York City—the ship's crew or the stevedore's men? A. That is generally settled between the captain and the charter party. Q. As matter of fact you have been on a good many ships, haven't you? A. On some occasions the ship's crew run them and on some ours. Q. In the last 5 years how many ships do you suppose you have worked on? A. One every two weeks probably. Q. In 5 years that would make 125 boats any how? A. Yes. Q. Out of those 125 boats how many of them had their winches run by the ship's crew and how many by the stevedore's crew? A. In my opinion it is just according to the orders we get. Q. I say as matter of fact? A. As matter of fact it is equal, as far as I could go it is equal. If the ship's crew are running them it is all right, there is no objection. Q. Did you make any objection on this occasion to the ship's crew running the winches? A. No, sir."

This amount was paid in a bill of the Atlantic Stevedoring Company to the steamer and owners.

2. The next item, $160.80, is of September 27, 1905, for wages of winchmen loading at New York.

When the steamer came in on this occasion, she was again loaded, mostly with case oil, by the Atlantic Stevedoring Company. Spillane saw the captain of the steamer and said:

"I asked him if he was going to drive the winches or I to do it this time. He told me to do it as he had plenty of work for his men around the ship; to put on my men."

He then produced a voucher, signed by the mate and the master of the steamer, showing 102 hours of work. He further said that there was no objection made by his men to working with the winchmen of the ship because they were not members of the Labor Union and that sometimes they used the ship's men.

Mr. Tiffany testified that he had a conversation with the master on this trip to the same effect as the first, above quoted, and that the captain never made any objection to his, Mr. Tiffany's, men working on the winches.

3. The next item, $73.50, April 5, 1906, is for wages of winchmen unloading at New York.

On this occasion the vessel was discharging large sticks of quebracho wood "which is very awkward stuff to handle and very dangerous," the sticks weighing from fifty pounds to two or three tons. It was expedient for the men of one Nordenholt to do the work and no objections seem to have been made to it. A voucher for the time, 210 hours at 35 cts., $73.50, was signed by the mate. A bill for the discharging which included this item was rendered to the respondent and paid by it. To this the respondent claims a commission of 2½ % should be added, making $75.34.

4. The next item, $101.08, August 25, 1906, is for wages of winchmen unloading at Buenos Ayres.

Captain Olsen was representing the respondent at the River Plate in the summer of 1905 at the time this steamer was there. He was on board of the steamer about every day while she was there and saw the members of the crew were not competent to run the winches because they were so much under the influence of liquor that it was unsafe; that one day he was talking to the chief officer of the steamer when the stevedore foreman asked for another man to whom the chief officer replied:

"I haven't got another sober man to put on there."

He further said:

"Q. But when you saw them you say they were what—sober or not? A. I saw them every day and one man might be not competent for the winch in the morning and might be all right in the afternoon; and it might be a couple, three or four or several of them; they would go ashore and come back right along the whole day and nights too. Q. What did they go ashore for? A. For drinks."

. A bill for the winchmen's time in detail on this occasion was rendered to the libellant and produced by it at the trial on demand of the respondent. This contained the following statement signed by the master:

"Bill correct charges to be either for Time charter or owners as pr protest of 31 Mai 1905 and 3 of June 1905."

There is some question as to the time the statement was placed on the voucher, the respondent's witness, Mr. Kimball, said he saw the bill when it first came from South America but does not recollect that he ever saw the language of the statement before.

5. The next item, $140.40, December 5, 1905, is also for wages of winchmen at Buenos Ayres.

Captain Swartridge, then representing the respondent at the place, said that there was not the slightest objection to the use of the shore men in running the winches, that the ship needed the winchmen and there was no question of any rule or union preventing the shore men from working with the ship's winchmen. He also said that the shore men did run the winches. A time sheet or voucher was produced, signed by the master and mate, with the statement:

"Signed under protest according to letter send agents on the 22 Okt 1905."

The testimony with respect to this voucher was substantially the same as to the preceding item. This witness also said that the shore winchmen did not run the winches on all of the respondent's vessels and that nearly every ship that entered Buenos Ayres had trouble with its crew from drunkenness unless it had a Chinese crew.

The defence to these claims on the facts is substantially that at Buenos Ayres the vessel had a full crew and at all times sufficient competent men to run the winches. The master testified that he had seen his crew drive the winches and knew that they were driving winches before going to Buenos Ayres. The second mate testified that with respect to the first voyage to Brazil, the vessel had a crew sufficient and competent for the purpose. And they both testified that the men were not drunk or ashore. The master also said that the reason the ship's men were not used was there was a union rule, and the stevedore's men could not work with the ship's men.

The claim with respect to New York is substantially the same.

It is contended in libellant's brief that the master made a protest in writing to the Buenos Ayres agents of the charterer against the use of shore winchmen, but no trace of such protest appears and if it was made and delivered as stated there is no evidence of its contents beyond that a protest was made against the use of shore winchmen. The counsel for the libellant called for this protest, to which counsel for the respondent replied:

"We have no such protest in our possession so far as I know."

Other protests were mentioned in the master's depositions as quoted above, but the protests were not produced. On cross-examination the master said with respect to the New York one:

"Q. To whom was the protest made that you say you made in New York? A. The only protest I made was made out here. Q. At Convers & Kirlin's office? A. Yes. Q. What was the protest about? A. I don't remember; it must be in the papers there; I don't remember any more now. Q. You didn't make any written protest direct to Barber & Company? A. Not except that one I made up here as far as I remember, and I can't remember three years after, but I made it up here at Convers & Kirlin's office. Q. Do you remember about what time that was that you made that? A. No sir, not now; I can't swear to the date; it must be in the papers. Q. Who has those papers? A. I think Convers & Kirlin have them."

The protest was not produced or accounted for, nor have those mentioned in the exhibits above, dated respectively May 31, 1905, and June 3, 1905, Oct. ("Okt") 22, 1905, and there is nothing to show what was contained in them.

The libellant depends altogether on the case of Constantine & Pickering Co. v. Tweedie Trading Co., 159 Fed. 706, 86 C. C. A. 574, in support of its claim, but it does not seem that that authority would overcome the testimony with respect to the New York work, it appearing that the master had authorized the use of shore winchmen there with respect to the loading, and with regard to the discharging of the quebracho wood, it was obviously to the interest of all concerned that this wood should be handled by experienced men. I think the authority, however, covers the Buenos Ayres discharges. There is a deficiency of testimony with respect to the work there and in view of

the depositions of the master and the mate, and the absence of sufficient contradictory testimony, the libellant should succeed with regard to the Buenos Ayres claims.

The libellant also urges that the charterer, notwithstanding the master's consent, was bound by the terms of the contract, which precluded the use of shore winchmen, but it does not seem clear that the parties intended to exclude such use. Assuming, however, that such is the case, it seems that the principle recently adopted by me in the case of Winchester Noyes v. Munson S. S. Line (D. C.) 173 Fed. 814, dated November 11, 1909, would govern. In that case there were defective winches. It was said in the opinion:

"4. The next deduction claimed, $237, was on account of defective winches. When the steamer arrived in New York December 12, 1905, her winches were badly broken, three of them could not be used at all, and one of them could only be used in part. The engineer testified that on a voyage from Progresso to Staten Island, on December 9th, '* * * everything broke adrift, smashed up.' The deck cargo, mahogany logs, 'broke adrift and broke the winches, at least the deck winches. * * * On Sunday morning No. 4 winch badly broken by loose logs, 12:30: both frames of No. 4 winch broken. * * *' The cargo was discharged, 'Some of it was by winches and some of it was by steam hoisting gear that came alongside—using the poop winch and the middle winch and the fore winch. * * * Q. So what winches were there that could not be used? A. No. 2, No. 3 and No. 4 * * * No. 4 was absolutely in pieces. * * * Q. When you arrived in New York on December 12 how many winches were there out of repair? A. Three. Q. Weren't there four? A. Well when we arrived for them to start cargo there were only three. There were four when we arrived, but we fixed No. 1 for them the next morning. Q. When you arrived four were in such condition you could not work them? A. They were broken. Q. How many winches have you in all upon the vessel? A. Six. * * * There were only two winches that were not touched—the bridge deck winch and the poop winch.'

Under the circumstances, the master and the charterer entered into an agreement to have a steam hoister assist in the discharge, the charterer agreeing to pay hire and the owner to stand the extra expense of discharging, caused by the defective condition of the winches. The vessel was thus delayed one day longer than usual, the hire for which period would be $135, and the charterer paid for hoisting and extra labor $102. This made $237, for which the master approved a voucher.

The master, it is urged, exceeded his authority in making this agreement, as it was contrary to the charter party. This was perhaps true, unless the master was, under the circumstances, justified in compromising the matter. The ship would have been liable for lost time while she was out of condition for work. The Munson S. S. Line v. Miramar S. S. Co., supra [(D. C.) 150 Fed. 437], and it was undoubtedly for her benefit that an adjustment should be reached as soon as practicable. It seems to me that the master adopted a wise course in preventing delay.

In the Edward H. Blake, 92 Fed. 202 [34 C. C. A. 297], a dispute as to the meaning of 'a small quantity of oak ties' was compromised by the master. It was held, as stated in the syllabus:

'While a master has no power to set aside the contract made by the charter party, yet where, at the time of loading, questions arise between the ship and the charterer as to the proper construction of minor clauses in the contract, in the absence of the owners, the master, as their agent, must necessarily deal with the same, and his construction and agreements in relation thereto are binding on the owners.' "

Decree for the libellant for $241.48, with interest.